### ROY BELL V. THE STATE.

No. 18678. Delivered December 23, 1936.

The opinion states the case.

*Edwin M. Fulton,* of Gilmer, and *Robert W. Cummins,* of Center, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for polluting a water course; punishment, a fine of One Hundred Dollars.

It is provided by the terms of Art. 698, P. C., that any person who shall pollute any water course or other public body

of water by throwing, casting or depositing, or causing to be thrown, cast or deposited any crude petroleum, oil or other like substance * * * from which water is taken for the use of farm live stock, drinking for domestic purposes, etc., shall be deemed guilty of an offense, and "Each day such pollution is knowingly caused or permitted shall constitute a separate offense." A violator of this law shall be punished by a fine of not less than one hundred dollars and not more than one thousand dollars.

The facts narrated by the State witnesses in this case go no further than to show that at about 5:30 o'clock on the morning of the 7th of March, 1936, oil was observed flowing from certain wells into what is known as Rabbit Creek, a tributary of the Sabine River. Mr. Dodson, the first witness, testified that he was informed of this pollution by Mr. Cove. Just who Mr. Cove is is not clear, as he did not testify. Mr. Dodson said he was informed of this about 3 o'clock in the afternoon of March 7th, and that he saw this appellant about 4 o'clock. He observed the oil flowing from the tanks down to the creek, a distance of some three hundred feet, and observed the oil on the waters of the creek down to the Sabine River. He testified to the efforts made by appellant and his employees to destroy, burn up and remove the oil on the water and between the tanks and the creek. The State's next witness was Mr. Hopson, who testified that the oil tanks in question had overflowed, and oil had run down the side of the hill into Rabbit Creek, and he saw oil on the creek, but did not follow it far down the water course. Both he and Mr. Dodson testified that appellant was operating a lease where the oil tanks were.

For the defense appellant testified that he was employed as production man by Bell & Grady, Incorporated, and that he had been living on a lease of theirs for the last year. He testified that he was on the lease on the 6th of March and that night and that no oil was escaping from the tanks on the 6th, but on the night of March 7th some one opened the valve, which allowed oil to flow into the tanks and caused them to overflow and waste the oil. He testified to the extent of the arrangements made by his company to care for overflow, if any occurred. He also said that the first information he had of the overflow was about 5:20 a. m. on the morning of the 7th when a man who lived near the tanks came over to his house and awakened him and told him the tanks were running over; also that this man had waded through the oil out to the well and shut it off, and that he immediately got men, teams and equipment to try to stop this oil from going into the creek,

and they did the best they could to prevent it; that the teams got there about 7 o'clock, and immediately started to work cleaning up the oil and burning it, and doing the best they could to prevent it from getting any further down the creek, and kept up this work all day and until 12 o'clock that night, started to work the next morning, and kept at work until they had burned up and cleaned up all the oil they could; that they had completed this work by noon the day following the time the flow started. He testified positively that whoever opened these valves did so without his authority, and that he did not do it himself. He was superintendent of production for the company named, and had charge of this particular lease. Mr. Sessions testified that he lived close to the lease in question,— about fifty yards from the tanks, and that about 5 o'clock on the morning of the 7th of March he was awakened and gas was strong around the house; he got up and dressed and went down to appellant's place and told him the tanks were running over. He testified that he worked with Mr. Bell, who had four men and two teams, and it took them about two days of constant work to clean up the oil that had overflowed.

In our opinion these facts do not make out a case of guilt against this appellant. It is apparent from the language of the statute that to constitute guilt the party responsible must knowingly cause or permit the polluting substance to be thrown, cast or deposited in or near the water course or other public body of water. We find an utter lack of testimony in the case before us to show that Mr. Bell knowingly caused or permitted the escape of the oil in question. He testified that by reason of such escape his company lost about two thousand barrels of oil.

In his brief counsel for appellant have cited a number of authorities bearing on the general proposition that the accused would not be guilty unless he knew of the escape of the polluting substance and intentionally permitted or allowed it to escape in such manner as would likely pollute a water course or public body of water. Without taking time or space to analyze the authorites cited, we refer to them and find them in point. See Jackson v. State, 93 S. W. (2d) 1141; Stacey v. State, 114 S. W., 807; Vaughn v. State, 219 S. W., 206; State of Maine v. Swett, 29 L. R. A., 714.

Being of the opinion that the facts in the case do not justify this conviction or show the guilt of this appellant, the judgment is reversed and the cause remanded.

*Reversed and remanded.*